**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-------------------------------- x
PAMELA DANIELS,                   :
                                  :
          Plaintiff,              :
                                  :
                                  :
                                  :
                                  :
                                  :
v.                                :
                                  : Civil No. 3:24-cv-1792 (AWT)
LMV HEALTHCARE, INC., D/B/A       :
WESTERLY HOSPITAL,                :
                                  :
          Defendant.              :
                                  :
                                  :
                                  :
                                  :
-------------------------------- X
```

<u>**RULING ON MOTION FOR SUMMARY JUDGMENT**</u>

Plaintiff Pamela Daniels brings a five-count complaint against her employer, defendant LMV Healthcare, Inc. d/b/a Westerly Hospital ("Westerly Hospital"). Daniels claims that Westerly Hospital violated her rights under federal and Rhode Island anti-discrimination laws when Westerly Hospital did not hire her for a 24-hour per week laboratory technician position. The First Count is a claim for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 <u>et</u> <u>seq.</u> (the "ADEA"). The Second Count is a claim for age discrimination in violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-7 <u>et</u> <u>seq.</u> ("RIFEPA"). The

-1-

Third Count is a claim for retaliation in violation of the ADEA. The Fourth Count is a claim for retaliation in violation of the RIFEPA. The Fifth Count is a claim for retaliation in violation of the Rhode Island Civil Rights Act, R.I. Gen. Laws § 42-112-1 et seq. ("RICRA"). The defendant has moved for summary judgment on all counts.

For the reasons set forth below, the motion for summary judgment is being granted in part and denied in part.

## I.    FACTUAL BACKGROUND

Prior to working at Westerly Hospital, Pamela Daniels retired from her job with the State of Connecticut. Daniels testified: "In order to leave the State of Connecticut and get my health benefits, I had to technically retire." Pamela Daniels Deposition (ECF No. 44-3) at 18:22-24 ("Daniels Depo."). At one point, Daniels's Facebook profile stated that she was "semi-retired." ECF No. 44-3 at 36. Daniels testified that, to her, she was "semi-retired" because she retired from the State of Connecticut before she was eligible for her full pension.

In 2017, Daniels began working at Westerly Hospital as a laboratory technician. Daniels is a member of a team responsible for analyzing patient specimens--e.g., blood or urine--and reporting those results to the ordering physician.

Initially, Daniels had a 24-hour per week laboratory technician position, and because she had such a position, she

was able to be a member of the union. In a 24-hour per week position, a technician is scheduled for 24 hours and can sign up to work additional hours. In 2022, Daniels applied and was selected for an eight-hour per week laboratory technician position. The position had been vacant for more than two years, and Daniels was the sole applicant for the eight-hour position. Daniels testified that she applied for the eight-hour per week position because that position did not require her to work on weekends. When Daniels moved to the eight-hour per week position, she was no longer eligible for union membership. "However, she regularly utilized the open shift log to pick up additional hours at her convenience, often working upwards of 100 hours per month for the remainder of 2022 and into 2023." Local Rule 56(a)(1) Statement (ECF No. 44-2) ¶ 15 ("DSF").

In 2023, the Westerly Hospital laboratory underwent staffing changes which were caused by the departure of a 40-hour per week technician and the retirement of a 24-hour per week technician. Hilmarie Cunningham, who was the manager of the laboratory at Westerly Hospital and responsible for creating the technicians' staffing schedule, testified that, based on an assessment of the lab's staffing needs, the 40-hour position would not be filled, but the gap in weekend coverage created by the 24-hour per week technician's departure would need to be filled. Cunningham testified that the laboratory's staffing

-3-

needs are based on the number of specimens the laboratory receives each hour, the time it takes to complete analysis of those specimens, and the number of technicians needed to complete specimen analyses. Cunningham also testified that she draws from a slate of full-time, part-time, and per diem laboratory technicians to create a schedule that has no gaps in coverage.

As a result of the staffing assessment, Daniels was informed that her position would no longer be limited to weekdays and she would be assigned to work weekends. Cunningham testified that, at the time she told Daniels about the change, all other Westerly Hospital laboratory technicians were already being assigned to weekend shifts. In response, Daniels told Cunningham that she would quit if she was assigned to work weekends. However, Daniels did not quit.

Subsequently, Cunningham testified that, in response to being informed that she may have to work weekends, Daniels said, "I don't need this job". 1/7/2026 Hilmarie Cunningham Deposition (ECF No. 44-3) at 41:14-15 ("1/7/26 Cunningham Depo."). Later, in an August 16, 2023 meeting, Daniels denied saying this. See Exhibit 7 to Declaration of Counsel (ECF No. 44-4) at 22 min., 20-30 sec. ("8/16/23 Recording") ("I don't think that anybody can determine it and say why someone doesn't need a job. And I

-4-

did not say that. I said I would quit.").[1]

Around the same time, Daniels submitted a job application, dated July 1, 2023, for a 24-hour per week laboratory technician position at Westerly Hospital. This position required working weekday shifts and a shift every other weekend. On her application, Daniels indicated that she would accept weekend shifts. The job description for the position stated that "Previous Experience is Desirable But Not Required" and that an American Society of Clinical Pathologists (MT-Ascp) license was preferred. On her application, Daniels stated that she had the MT-Ascp license. In the application, Daniels provided the following reason for leaving her current position: "Increasing my hours to 24 because my current 8 hour position is being transitioned to weekends only. The work volume on weekends is extremely low and I will not be able to keep up my skills. I enjoy a busier work environment than weekends offer." ECF No. 44-3 at 45. Later, in an August 16, 2023 meeting with Cunningham and other managers, Daniels explained, "If I'm going to back on weekends, I might as well apply for the 24-hour position. And that's what I did." 8/16/23 Recording at 13 min., 13-20 sec.

Cunningham interviewed Daniels for the 24-hour per week position on July 6, 2023. Daniels testified that Cunningham

---

[1] The plaintiff recorded the audio of the meeting between her, Cunningham, Persad, and Caillouette on a personal device. See 8/16/23 Recording.

began the interview by "saying that just because I worked there, had experience, had no problems with yearly reviews that I wasn't necessarily going to get the job." Daniels Depo. at 36:10-13. Cunningham informed Daniels that she was not the only applicant for the 24-hour per week position. Daniels was told that she was competing with Adam Vocatura, a recent graduate who had completed an internship at Westerly Hospital's laboratory and taken a per diem position and hoped to secure a full-time position. Cunningham interviewed both Daniels and Vocatura for the position.

Daniels testified that, during the interview, Cunningham told her that she "didn't need the job." Daniels Depo. at 12-13. During her deposition, Cunningham confirmed that she did indeed say this during the interview, but she also testified that Daniels had also said "I don't need the job." See 1/7/2026 Cunningham Depo. at 40:20-22, 41:13-15 ("[S]he said, 'Hilmarie, I don't need this job,' which is also she repeated after, when I interviewed her. And I told her, you know, 'What is the motivation then?' And she said it to me multiple times."). Cunningham explained that she was "quot[ing] [Daniels's] words." Id. at 40:20-22.

On July 7, 2023, i.e. the day after the job interview, Daniels sent an email to Cunningham's supervisor, Nicole Caillouette, and Westerly Hospital's Human Resources Manager,

Duane Persad, with a copy to Cunningham. In that email, Daniels

wrote:

> I am emailing with regard to the above position which I
> have applied for. I had a teams meeting call with Hilmarie
> on Thursday the 6th. During that meeting, I was informed
> there is a possibility that I may not be offered the
> position because a graduating student has applied as well.
>
> The reason I was given was that "I don't need the job",
> literally and verbatim. This is a correct statement in
> terms of healthcare benefits, which is in turn a benefit to
> the Yale System by the way, but there are numerous reasons
> for needing a job. They are not just healthcare benefits or
> financial payment. I'm struggling to understand the merit
> in that statement. Furthermore, this is a position I once
> held so I am obviously qualified, have ASCP certification,
> have 41+ years of experience[.] . . .
>
> If I am to be discounted, I would like to have a meeting
> with HR and the lab manager/supervisor to explain exactly
> on what grounds this refusal to offer me the position may
> occur.

ECF No. 44-3 at 49 (emphasis added). None of the three

recipients responded to this email, and the hiring decision was

made before Daniels had an opportunity to discuss her concerns

with any of them.

Persad testified that, after Daniels and Vocatura were

interviewed, Cunningham met with Caillouette and Persad to

discuss the applicants. Both candidates had the minimum

qualifications for the position, and neither candidate was a

union member at the time. With respect to how seniority, union

membership, and the laboratory's scheduling needs were

considered in the hiring decision, Persad testified:

Q. . . . [I]f someone was a Union member and was applying for [the position], it could have played into it, but that didn't occur in this situation?
A. That's correct. . . . Seniority would also play a factor. So if there are multiple employees who were part of the Union and applied, then we'd have to look at the qualifications. If they both met the qualifications, then we'd look at seniority as a factor in that decision.

Q. Did seniority matter even if someone wasn't a member of the Union?
A. No, not in that case.

Q. So prior experience at the hospital or the lab in Westerly was not a factor to be considered in who got this position?
A. It was a factor. It's always a factor. But what we also look at is the operational aspects of things. . . . [W]e have to also make sure that from a scheduling standpoint, it is something that makes sense.

Duane Persad Deposition (ECF No. 44-3) at 17:18-18:11.

Cunningham testified about the importance of the laboratory's scheduling needs in the hiring decision, stating: "If we hire Pam Daniels for the 24 hours, the eight hours was gonna be open. It took us a long time to fill that position[.]". 1/7/26 Cunningham Depo. at 12:18-20. Caillouette's testimony was similar during her deposition:

Q. . . . [Y]ou believe that [Daniels's] greater experience did not make her the best qualified candidate for . . . this position?
A. The decision as to the best person for this position was made based on operational needs of the department.

Q. And define what you mean by that, operational needs?
A. . . . [F]illing a part-time position, a 24 hour position with someone who is a per diem, right, that then allows us to be full[y] staffed. I believe that eight hour position had been vacant for quite some time and was hard to fill.

Nicole Caillouette Deposition (ECF No. 44-3) at 54:12-24.

On July 31, 2023, Cunningham sent Daniels an email notifying her that Vocatura had been selected for the position. She wrote, in relevant part:

I'm not sure if you received the notification yet. But I wanted to let you know that after careful consideration and after reviewing the needs of the Lab, the decision was made to offer the 24 [h]our position to Adam. We know and appreciate your hard work and hope you can continue to work with us in your current position. The changes in staff and workload have been challenging in the past year and therefore changes to the schedules must be made. This will not only affect you, but other techs in the lab will be affected as well and their days off will be moved.

ECF No. 44-3 at 53. After she received the email, Daniels responded:

Yes, I do have questions as to what the reason for the decision. I have asked for a meeting with Duane [Persad], Nicole [Caillouette] and you and no one has answered my email from the 7th of July. Please follow up with this email from the 7th as w[e]ll as this one.

Id. Cunningham invited Daniels to her office to talk about the hiring decision.

During that meeting, which took place on July 31, 2023, Daniels asked Cunningham about her decision to hire Vocatura for the 24-hour per week position. Cunningham "told [her] that Adam was a better fit, and he met the operational needs of the lab." Daniels Depo. at 59:6-10. In response, Daniels noted that Vocatura intended to get a full-time job, and stated that "he could technically find a full-time job in three, six months and

-9-

leave." Id. at 59:14-16. Cunningham responded, "Well, you could do the same. You could retire." Id. at 59:17-18. Daniels also shared her view that her current 8-hour position could be posted and potentially filled, and Cunningham explained that hiring Vocatura left her fully staffed for scheduling purposes. The meeting ended with Daniels stating that she would follow up with Persad.

A video meeting was held on August 16, 2023. In attendance were Daniels, Cunningham, Persad, and Caillouette. During the meeting, Daniels questioned the rationale for the decision to hire Vocatura instead of her. In response, Cunningham stated, "I would lose Adam and have an eight-hour position open if I chose [Daniels]. And if I chose Adam, I would be full staff with no holes in the schedule." 8/16/23 Recording at 7 min., 8 to 25 sec.

Later in the meeting, Daniels asked why Cunningham was concerned about her retiring but not concerned about Vocatura leaving to find full-time employment. Cunningham responded: "I know you work eight hours 'cause you're semi-retired, right, and you're trying to enjoy your retirement." Id. at 18 min., 24 sec. to 19 min., 13 sec. Daniels responded, "I'm trying to enjoy life, it's not retirement." Id. at 19:13-15. Cunningham then stated "I know you're trying to work less so you can retire." Id. at 19 min., 20 to 24 sec. Persad interjected, saying "I want

-10-

to make sure we're crystal clear here that [age] was not part of your rationale, Hilmarie." Id. at 19 min., 36 to 41 sec. Cunningham responded, "No, it wasn't. It wasn't at all. She brought up [the fact that Vocatura] could get another job and he was gonna leave. [inaudible] And because she's in that state, that she's semi-retired, [inaudible] maybe she'll decide tomorrow that she's gonna retire." Id. at 19 min., 41 sec. to 20 min., 2 sec.

Following the hiring decision, Cunningham encouraged Daniels to continue picking up open shifts. In August 2023, Cunningham wrote in an email to Daniels that, notwithstanding the fact that union members have priority for open shifts, "there are shifts posted that have not been picked up yet. I will encourage you to sign up for those shifts. Keep in mind that there also could be times where you will be the only one being signing up for . . . shifts." DSF ¶ 51.

"Plaintiff filed an administrative complaint with the Rhode Island Commission on Human Rights (RIHCR) and EEOC on January 17, 2024. Plaintiff requested and received a notice of right to sue from the RIHCR which has been granted." ECF No. 1-1 ¶ 25.

In November 2024, Daniels received her performance evaluation for 2024, which was her first evaluation after filing her administrative complaint. She was rated as "Fully Meets Expectations." DSF ¶ 53. This was the same rating she received

in 2022. However, Daniels testified that this performance evaluation was "very different from 2023." Daniels Depo. at 127:20-21. According to Daniels, she "scored lower on most things, especially when it came to behavior. It's never about my work. . . . There were some things that needed improvement, and I've never received that before. . . . It was mostly about the standards of professional behavior, caring, kindness[.]" Id. at 128:9-21. Daniels testified that she had never been told that she was unkind to any other worker in the laboratory; nor was she aware of any other employees complaining about her behavior.

During November 2024, Daniels also received feedback from Caillouette and Cunningham regarding the "tone Plaintiff used in internal email correspondence." DSF ¶ 54. When asked to elaborate on the substance of this feedback from Caillouette and Cunningham, Daniels testified: "They just read the e-mails and said that they sounded--the tone of the e-mails and the words that I used seemed aggressive." Daniels Depo. at 124:6-8. Daniels testified that Caillouette gave her a paper describing "the standards of professional behavior, . . . and said that I was expected to meet them." Id. at 129:10-13. Daniels considered this feedback to be a "verbal warning." She testified that she has received no other feedback about the tone of her emails since then.

Daniels is currently employed at Westerly Hospital in the

same eight-hour per week technician position she has held since 2022. Daniels has not been demoted or discharged and has continued to receive her standard annual pay increases.

## II.   LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce of Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

-13-

inferences from the facts are jury functions, not those of the judge . . . ." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the

motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. See Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014) ("'[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" (quoting Celotex, 477 U.S. at 323)). Immaterial factual disputes will not prevent summary judgment.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant . . . and draw all reasonable inferences in [the non-movant's] favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990) (alteration in original)). Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (Calabresi, J., dissenting) (internal quotation marks omitted) (quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find

-15-

for the [nonmovant]." Anderson, 477 U.S. at 252.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," id., if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial," Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (emphasis, quotation marks and citations omitted). If the nonmovant fails to meet this burden, summary judgment should be granted.

## III. DISCUSSION

### A. First and Second Counts: Age Discrimination Claims

Daniels claims that Westerly Hospital discriminated against her because of her age in violation of the ADEA and the RIFEPA when it hired Vocatura instead of her for the 24-hour per week position.

"The ADEA provides, in relevant part, that '[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009)

(alterations in original) (quoting 29 U.S.C. § 623(a)(1)).

> We analyze employment-discrimination claims under the ADA, Title VII, and the ADEA using the now-familiar burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that framework, a plaintiff must first establish a prima facie case of discrimination, which causes the burden of production to shift to the defendant to offer a legitimate, nondiscriminatory rationale for its actions. If the defendant satisfies its burden of production, then the presumption raised by the prima facie case is rebutted and drops from the case, such that at the final stage, the plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.

Kovaco v. Rockbestos-Surprenant Cable Corp., 834 F.3d 128, 136 (2d Cir. 2016) (cleaned up).

The ADEA requires a plaintiff to "prove that age was the 'but-for' cause of the employer's adverse decision." Gross, 557 U.S. at 176. "But-for causation does not require that [the plaintiff] prove that age discrimination was the only cause of [the defendant]'s adverse action, but only that [the adverse action] would not have been [taken] in the absence of a discriminatory motive." Zurich Am. Life Ins. Co. v. Nagel, 590 F. Supp. 3d 702, 730 (S.D.N.Y. 2022) (citing Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 846 (2d Cir. 2013)). "There can be multiple but-for causes." Id. (citing Zann Kwan, 737 F.3d at 846 n.5.). Footnote 5 in Zann Kwan reads, in relevant part:

> Requiring proof that a prohibited consideration was a "but-for" cause of an adverse action does not equate to a burden to show that such consideration was the "sole" cause. See, e.g., Fagan v. U.S. Carpet Installation, Inc., 770 F. Supp.

-17-

2d 490, 496 (E.D.N.Y.2011) (explaining that under the Age Discrimination in Employment Act "[t]he condition that a plaintiff's age must be the 'but for' cause of the adverse employment action is not equivalent to a requirement that age was the employer's only consideration, but rather that the adverse employment action[] would not have occurred without it.") (citation omitted).

737 F.3d at 846 n.5. (first alteration in original).

"In the employment discrimination context, this means 'a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's [protected characteristic] was one but-for cause of that decision, that is enough to trigger the law.'" Sanders-Peay v. New York City Dep't of Educ., 2024 WL 5007387, at *4 (E.D.N.Y. Dec. 6, 2024) (quoting Bostock v. Clayton Cnty., 590 U.S. 644, 656 (2020)). In Bostock, the Supreme Court gave guidance on how to apply the but-for test:

> That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause. See Gross, 557 U.S. at 176. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.
>
> This can be a sweeping standard. Often, events have multiple but-for causes. So, for example, if a car accident occurred both because the defendant ran a red light and because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision. Cf. Burrage v. United States, 571 U.S. 204, 211–212 (2014). When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's [protected characteristic] was one but-for cause of that decision, that is enough to trigger

-18-

the law. See id.; Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 350 (2013).

590 U.S. at 656.

"The RIFEPA states the refusal 'to hire any applicant for employment' because of his or her age is 'an unlawful employment practice.'" Casey v. Town of Portsmouth, 861 A.2d 1032, 1036 (R.I. 2004) (quoting R.I. Gen. Laws § 28-5-7(1)(i)). "To provide understanding to the [RIFEPA], we look to the federal interpretations of Title VII of the Civil Rights Act of 1964." Id. (citation omitted). See also Drumm v. CVS Pharmacy, Inc., 701 F. Supp. 2d 200, 207 (D.R.I. 2010) ("In general, the RICRA and [RI]FEPA standards track those of federal law." (citing Neri v. Ross-Simons, Inc., 897 A.2d 42, 48 (R.I. 2006)). Like the ADEA, claims brought under the RIFEPA are analyzed under the McDonnell Douglas burden-shifting framework. See Newport Shipyard, Inc. v. Rhode Island Commission for Human Rights, 484 A.2d 893, 898 (R.I. 1984). "A plaintiff suing under RIFEPA, however, must only show that age 'was a motivating factor for [the unlawful] employment practice, even though the practice was also motivated by other factors.'" Travers v. Cotiviti, LLC, 2022 WL 834168, at *4 (D.R.I. Mar. 21, 2022) (second alteration in original) (quoting R.I. Gen. Laws § 28-5-7.3).

With respect to what constitutes age discrimination, the Supreme Court has stated:

> It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age. As we explained in EEOC v. Wyoming, 460 U.S. 226 (1983), Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes.
>
> "Although age discrimination rarely was based on the sort of animus motivating some other forms of discrimination, it was based in large part on stereotypes unsupported by objective fact. . . . Moreover, the available empirical evidence demonstrated that arbitrary age lines were in fact generally unfounded and that, as an overall matter, the performance of older workers was at least as good as that of younger workers." Id. at 231.
>
> Thus the ADEA commands that "employers are to evaluate [older] employees . . . on their merits and not their age." Western Air Lines, Inc. v. Criswell, 472 U.S. 400, 422 (1985). The employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly.
>
> When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is.

Hazen Paper Co. v. Biggins, 507 U.S. 604, 610-11 (1993) (alterations in original). An inference of discrimination can be drawn from "the employer's criticism of the plaintiff's performance in [age-related] degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [adverse employment action]." Abdu-Brisson v. Delta Air Lines, Inc., 239

F.3d 456, 468 (2d Cir. 2001) (citation omitted).

For the purposes of its motion for summary judgment only, the defendant does not dispute that the plaintiff can establish a prima facie case of age discrimination. In response to the plaintiff's prima facie case, Westerly Hospital offers a legitimate, nondiscriminatory rationale. It states that "[t]hree separate decision-makers each independently confirmed that the selection was driven by a straightforward operational rationale: maintaining full staffing by keeping Plaintiff in the eight-hour position that had remained vacant for more than two years before she filled it." Defendant's Memorandum in Support of Motion for Summary Judgment (ECF No. 44-1) at 1-2. Westerly Hospital argues that "Plaintiff rests her discrimination claim principally on a single remark by Cunningham referencing retirement--made after the hiring decision and in direct response to Plaintiff's own observation that the younger candidate might leave for a full-time position elsewhere." Id. at 2.

However, the plaintiff has produced evidence that, assessed in the light most favorable to her, suggests that Westerly Hospital decided to hire Vocatura instead of the plaintiff because of her age, using proximity to retirement as a proxy for age. A complicating factor here is that Westerly Hospital does not contend that the hiring decision was based on the plaintiff's proximity to retirement.

-21-

The analysis with respect to a claim where there is evidence that another factor was used as a proxy for age is highly fact-specific. In Kentucky Retirement Systems v. E.E.O.C., 554 U.S. 135 (2008), the court discussed Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993), where what was at issue was pension status, as follows:

> In Hazen Paper, the Court considered a disparate-treatment claim that an employer had unlawfully dismissed a 62-year-old employee with over 9½ years of service in order to avoid paying pension benefits that would have vested after 10 years. The Court held that, without more evidence of intent, the ADEA would not forbid dismissal of the claim. A dismissal based on pension status was not a dismissal "because of . . . age." 507 U.S. at 611-612. Of course, pension status depended upon years of service, and years of service typically go hand in hand with age. Id. at 611. But the two concepts were nonetheless "analytically distinct." Id. An employer could easily "take account of one while ignoring the other." Id. And the dismissal in question, if based purely upon pension status (related to years of service), would not embody the evils that led Congress to enact the ADEA in the first place: The dismissal was not based on a "prohibited stereotype" of older workers, did not produce any "attendant stigma" to those workers, and was not "the result of an inaccurate and denigrating generalization about age." Id. at 612.
>
> At the same time, Hazen Paper indicated that discrimination on the basis of pension status could sometimes be unlawful under the ADEA, in particular where pension status served as a "proxy for age." Id. at 613. Suppose, for example, an employer "target[ed] employees with a particular pension status on the assumption that these employees are likely to be older." Id. at 612-613. In such a case, Hazen Paper suggested, age, not pension status, would have "actually motivated" the employer's decisionmaking.

554 U.S. at 142-43 (alterations in original).

The plaintiff has produced evidence that, assessed in the

light most favorable to the plaintiff, could establish the following. The plaintiff threatened to quit at the time she was told she would have to work weekends, but despite that threat she did not quit. Consistent with the number of hours she had been working, the plaintiff stated in her job application that she wanted to increase her hours to 24 per week, that she desired to work more because she wanted to keep up her skills, and that she enjoyed a busier work environment than weekends offered. The plaintiff's job application also reflected that she had 41-plus years of experience, i.e., many more years of experience than Vocatura, and that she had an MT-Ascp license, which was desirable but not required, while Vocatura did not. All of this was known to Cunningham at the time she interviewed the plaintiff. Despite the foregoing, Cunningham told Daniels that she didn't need the job--after first telling the plaintiff (i) that, even though she had experience and had no problems with her yearly reviews, she was not necessarily going to get the job, and (ii) that the plaintiff was competing with Vocatura. This explanation for why Daniels might not get the job --not anything to do with Westerly Hospital's operational needs --was what the plaintiff took away from the interview, as evidenced by the email she sent to Persad and Caillouette, with a copy to Cunningham, the next morning.

Cunningham, of course, maintains that the plaintiff stated

that she didn't need the job during the meeting at which Cunningham informed the plaintiff that she would have to start working weekends, and also that the plaintiff repeated that statement during the interview on July 6, 2023. At this stage of the case, however, the court assesses the record in the light most favorable to the non-movant.

The plaintiff has also produced evidence that, assessed in the light most favorable to the plaintiff and drawing reasonable inferences in her favor, could establish that the rationale based on Westerly Hospital's operational needs was only developed after the decision to hire Vocatura had been made. Cunningham made references to retirement on more than one occasion. First, during the July 31, 2023 meeting in Cunningham's office, when what was being discussed was the fact that Vocatura could leave, Cunningham focused on the fact that the plaintiff could retire. Second, during the August 16, 2023 meeting, after Daniels told Cunningham that her current status was "not retirement," Cunningham again referred to the plaintiff working less so she could retire. Then again after Persad told Cunningham that he wanted to be clear that age was not a part of Cunningham's rationale, Cunningham said "because she's in that state, that she's semi-retired, . . . maybe she'll decide tomorrow that she's gonna retire." 8/16/23 Recording at 19 min., 55 sec. to 20 min., 2 sec.

-24-

In light of, inter alia, the foregoing evidence produced by the plaintiff, genuine issues of material fact exist, with respect to her claim under the ADEA, as to whether the plaintiff's age was a but-for cause of the adverse employment action. Also, in light of, inter alia, the foregoing evidence produced by the plaintiff, genuine issues of material fact exist, with respect to her claim under the RIFEPA, as to whether the plaintiff's age was a motivating factor for the adverse employment action.

Therefore the motion for summary judgment is being denied with respect to the First Count (the ADEA) and the Second Count (the RIFEPA).

### B. Third, Fourth, and Fifth Counts: Retaliation Claims

The Third, Fourth, and Fifth Counts are retaliation claims brought under the ADEA, the RIFEPA, and RICRA, respectively. Because claims brought under these three statutes are all evaluated under the McDonnell Douglas burden-shifting framework, they are evaluated together. See Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 2006) ("The ADEA contains a nearly identical provision prohibiting retaliation for complaining of employment discrimination on the basis of age [as Title VII], and the same standards and burdens apply to claims under both statutes[.]" (citations omitted)); McElroy v. Fid. Invs. Institutional Servs. Co., Inc., 298 F.

Supp. 3d 357, 364 (D.R.I. 2018) ("An analysis of each of the claims [including retaliation claims brought under RIFEPA and RICRA] . . . follows the same basic burden-shifting framework set forth in McDonnell Douglas Corp." (footnote omitted)).

The defendant argues that the plaintiff has failed to establish a prima facie case of retaliation. The court agrees.

To establish a prima facie case of retaliation, a plaintiff must demonstrate that:

> (1) the plaintiff was engaged in an activity protected under the ADEA; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) the plaintiff was subject to an adverse employment action; and (4) there is a nexus between the protected activity and the adverse action taken.

Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997).

With respect to the third prong of a prima facie case, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted). In Burlington N., the Court explained:

> We refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair

-26-

> discrepancies that can plague a judicial effort to
> determine a plaintiff's unusual subjective feelings. . . .
>
> We phrase the standard in general terms because the
> significance of any given act of retaliation will often
> depend upon the particular circumstances. Context matters.
> The real social impact of workplace behavior often depends
> on a constellation of surrounding circumstances,
> expectations, and relationships which are not fully
> captured by a simple recitation of the words used or the
> physical acts performed. A schedule change in an employee's
> work schedule may make little difference to many workers,
> but may matter enormously to a young mother with school-age
> children.

Id. at 68-69 (internal quotation marks and citations omitted).

"[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (quoting Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 227 (2d Cir. 2006)).

"Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Reynoso v. All Foods, Inc., 908 F. Supp. 2d 330, 342 (E.D.N.Y. 2012). Daniels has not been demoted or discharged and she has continued to receive her standard annual pay increases since filing her administrative

complaint. However, the absence of a demotion, discharge, or salary decrease is not dispositive as the court must consider incidents of alleged retaliation separately and in the aggregate. See Hicks, 593 F.3d at 165.

Daniels has provided evidence that she received feedback on how she interacted with her co-workers and supervisors after filing her administrative complaint. Feedback which "place[s] [an employee] in an active disciplinary process" can constitute an adverse employment action. Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 570 (2d Cir. 2011). However, "criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." Id. at 570. See, e.g., Gale v. City of Bridgeport, 2021 WL 4477388, at *12 (D. Conn. Sept. 30, 2021) ("The discipline here began with Captain Garcia's counseling Gale by emailing him to inform him of his alleged infraction. But counseling alone is not an adverse employment action." (citing Tepperwien, 663 F.3d at 570)); Harper v. Brooklyn Children's Ctr., 2014 WL 1154056, at *4 (E.D.N.Y. Mar. 20, 2014) ("Without more, no reasonable jury could conclude that two (2) disciplinary citations, i.e., the 2009 NOD charging him with abandoning his post, violating defendant's Safety Department Policy and Procedure and not being in uniform while on duty, which was ultimately dismissed; and

the November 11, 2009 counseling memorandum addressing an email he sent about an error made during a fire drill, might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (internal quotation marks and citations omitted)).

Here, "[i]n November of 2024, [Daniels] received verbal feedback from Caillouette and Cunningham regarding the tone [she] used in internal email correspondence." DSF ¶ 54. Daniels was told that her emails "seemed aggressive." Daniels Depo. at 124:8. Daniels considered this feedback to be a verbal warning. She has received no other feedback about the tone of her emails since then.

Daniels received similar feedback in her 2024 performance evaluation, which was her first since filing her administrative complaint. In this evaluation, Daniels received an overall rating of "Fully Meets Expectations." While this is the same overall rating she received in her 2022 evaluation, Daniels testified that her 2024 performance evaluation was "very different from 2023," Daniels Depo. at 127:20-21, and that she "scored lower on most things, especially when it came to behavior." Id. at 128:11-12. Daniels testified that this feedback "was mostly about [her] standards of professional behavior" and that she had "never received [this feedback] before." Id. at 128:9-21. However, nothing in the record

-29-

suggests that the verbal feedback (which Daniels considered to be a verbal warning) or the feedback in the 2024 performance evaluation, initiated an active disciplinary process. Therefore, these facts, individually and in combination, do not support an inference that Daniels suffered an adverse employment action. See Tepperwien, 663 F.3d at 570.

The plaintiff contends that her "access to additional hours and shift opportunities was curtailed, favoring a younger comparator who eventually secured full-time, union status." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (ECF No. 46) at 23. It is undisputed that Cunningham offered additional hours to part-time employees other than Daniels, including Vocatura, after Daniels filed her administrative complaint. But there is no genuine issue as to the fact that those additional work hours were not positions subject to a competitive hiring process; they were available because another technician had dropped them. See 11/10/2025 Hilmarie Cunningham Deposition (ECF No. 44-3) at 45:3-5 ("[T]his was not a position, it was somebody dropping hours and somebody else picking them up."). Nor is there a genuine issue as to the fact that Vocatura had union status once he was in the 24-hour per week position and that Cunningham was required to offer union employees the opportunity to work these hours before they were offered to non-union employees. See id. at 48:23-24

-30-

("[Daniels is] not a Union employee. So I have to offer it to Union employees before I offer it to anyone else."). A reasonable non-union employee would not be discouraged from making a charge of discrimination because her employer offered union employees the opportunity to work additional hours before offering it to non-union employees when the employer was required to do so.

In light of the foregoing, there is no genuine issue with respect to the fact that Daniels was not subject to an adverse employment action and, consequently, she cannot establish a prima facie case of retaliation. Therefore, the motion for summary judgment is being granted with respect to the Third (ADEA retaliation), Fourth (RIFEPA retaliation), and Fifth (RICRA retaliation) Counts.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (ECF No. 44) is hereby GRANTED in part and DENIED in part. Summary judgment is being granted with respect to the Third, Fourth, and Fifth Counts, and the motion is being denied with respect to the First and Second Counts.

-32-

It is so ordered.

Dated this 5th day of August 2026, at Hartford,

Connecticut.

_____
/s/AWT
Alvin W. Thompson
United States District Judge
